**MAJOR MART, INC., Plaintiff**

v.

**MITCHELL DISTRIBUTING COMPANY, INC. and Mitchell Beverage, LLC, Defendants.**

**Civil Action No. 3:13–CV–942–HTW–LRA.**

United States District Court, S.D. Mississippi, Northern Division.

Signed Aug. 14, 2014.

---

April Reeves Freeman, Kaytie M. Pickett, Neville H. Boschert, Jones Walker, LLP, Jackson, MS, for Plaintiff.

Clarence Webster, III, Forman, Perry, Watkins, Krutz & Tardy, LLP, Erin D. Saltaformaggio, Michael J. Bentley, Stephen Lee Thomas, W. Wayne Drinkwater, Jr., Bradley Arant Boult Cummings LLP, Jackson, MS, Richard Benjamin McMurtray, William C. Hammack, Glover, Young, Hammack, Walton, & Simmons, PLLC, Meridian, MS, for Defendants.

### *ORDER*

HENRY T. WINGATE, District Judge.

This case features a dispute between plaintiff Major Mart, Inc. ("Major Mart"), and defendants Mitchell Distributing Company, Inc. ("Mitchell Distributing"), and Mitchell Beverage, LLC ("Mitchell Beverage") (collectively "Mitchell"). Major Mart owns and operates eleven convenience stores in northern Mississippi. Mitchell is an Anheuser–Busch distributor. The core dispute here is whether Mitchell engaged in conduct violative of federal and state antitrust laws, aimed at Major Mart, an accusation that Mitchell denies.

Before this court are nine motions: a Motion to Dismiss [docket no. 12], filed by Mitchell under the auspices of Rule 12(b)(6)[1] of the Federal Rules of Civil Procedure; a Motion for Summary Judgment [docket no. 86], filed by Mitchell pursuant to the authority of Rule 56[2] of the Federal Rules of Civil Procedure; a Motion in Limine [docket no. 106], filed by Major Mart, to strike certain expert opinions of Greg Ellis and limit his expert testimony; a Motion in Limine [docket no. 107], filed by Major Mart, to strike certain expert opinions of William C. Myslinski and limit his expert testimony; a Motion in Limine [docket no. 108], filed by Major Mart, to strike certain expert opinions of Ralph J. Stephens and limit his expert testimony; a Motion for Summary Judgment [docket no. 113], filed by Mitchell Distributing as allowed by Rule 56 of the Federal Rules of Civil Procedure; a Motion to Strike Supplemental Trial Report of David C. Sharp [docket no. 118], filed by Mitchell; a Motion to Strike Jimmy Brown as a Potential Trial Witness [docket no. 119], filed by Mitchell; and a Motion in Limine to Exclude All Documents and Testimony Relating to Settlement Discussions [docket no. 121], filed by Mitchell.

Having reviewed the motions and their supporting documents, the court grants in part and denies in part the Motion to Dismiss [docket no. 12]. The court grants the Motion to Dismiss only as to Counts V and VI of the complaint.

The court grants in part and denies in part the Motion for Summary Judgment [docket no. 86]. The court grants the motion only as to the Robinson–Patman Act claim. The court denies the motion as to the Sherman Act claim, the Mississippi antitrust claim, and the tortious interference claim. The court also denies the Motion for Summary Judgment [docket no. 113].

The court grants the Motion in Limine [docket no. 106] to exclude the expert opinion of Greg Ellis; denies the Motion in Limine [docket no. 107] to exclude the expert opinions of William C. Myslinski; denies the Motion in Limine [docket no. 108] to exclude the expert opinion of Ralph J. Stephens; denies the Motion to Strike the Supplemental Trial Report of David C. Sharp [docket no. 118]; grants the Motion to Strike Jimmy Brown as a Potential Trial Witness [docket no. 119], and grants the Motion in Limine to Exclude All Documents and Testimony Relating to Settlement Discussions [docket no. 121].

## I. BACKGROUND

Major Mart, is a Mississippi corporation with its principal place of business in Starkville, Mississippi. Its president is Gregory Sharp ("Sharp"). Major Mart owns eleven "B–Quik" convenience stores in the following northeast Mississippi

---

1. Rule 12(b)(6) of the Federal Rules of Civil Procedure states:

 Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

 \* \* \*

 (6) failure to state a claim upon which relief can be granted. . . .

2. Rule 56(a) of the Federal Rules of Civil Procedure states:

 A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

towns: West Point, Clay County; Columbus, Lowndes County; Starkville, Oktibbeha County; Saltillo, Lee County; Baldwyn, Lee County; and New Albany, Union County. Major Mart's B–Quik stores sell, *inter alia*, tobacco products, gasoline, and light wine and beer.

Mississippi has created a special format for distribution of light wine and beer. Each manufacturer must create sales territories within the state and name one licensed wholesaler to service that territory with the manufacturer's brand. Miss. Code Ann. § 27–71–349(1).[3] The licensed wholesaler must sell the light wine or beer to retailers within the territory "without discrimination in service." Miss.Code Ann. § 27–71–349(2).[4]

Mitchell Distributing is a Mississippi corporation with its principal place of business in Meridian, Mississippi. Mitchell Distributing is a beer distributor licensed by the State of Mississippi to sell Anheuser–Busch beer in the following Mississippi counties: Winston County, Neshoba County, Kemper County, Scott County, Newton County, Lauderdale County, and Clarke County.

Mitchell Beverage is a Mississippi limited liability company that has its principal place of business in Meridian, Mississippi. Mitchell Beverage is licensed by the State of Mississippi to sell Anheuser–Busch beer in Prentiss County, the southern part of Tishomingo County, Union County, Lee County, Itawamba County, Chickasaw County, Monroe County, Clay County, Lowndes County, Oktibbeha County, and Noxubee County.

Manny Mitchell ("Manny") owns 30% of Mitchell Beverage. Manny Depo. at 15, docket no. 104, exh. 2. The remaining 70% is divided equally between two trusts held for the benefit of his son and daughter, Adam Mitchell ("Adam")[5] and Emily Mitchell Athanas. *Id.* Adam serves as the President of Mitchell Beverage and Mitchell Distributing.

Major Mart claims to have sold Anheuser–Busch products in its retail stores for over thirty-two years. Prior to November 2008, the Anheuser–Busch wholesaler for the territory in which Major Mart did business was Cash Distributing Company. Major Mart claims it had a good working

---

**3.** Miss.Code. Ann. § 27–71–349(1) states:
Every manufacturer or importer of light wine or beer shall designate sales territories for each of its brands sold in Mississippi and shall name one (1) licensed light wine or beer wholesaler in each territory who, within such territory, shall be the licensed wholesaler for the brand or brands assigned by the manufacturer or importer. If the manufacturer or importer supplies more than one (1) brand, sales territories may be granted to a different wholesaler for the sale of each brand. No licensed wholesaler shall distribute the specified brand or brands of light wine or beer outside his assigned territory, nor shall he knowingly sell to a retailer whose licensed retail establishment is located outside his assigned territory.

**4.** Miss.Code. Ann. § 27–71–349(2) states:
A licensed wholesaler designated as the licensed wholesaler for light wine or beer

within a designated sales territory shall present that light wine or beer for sale to all licensed retailers within the designated sales territory without discrimination in service. A licensed wholesaler shall not sell, supply or deliver, either directly or indirectly through a third party, any light wine or beer to a licensed retailer outside of the designated sales territory of the designated wholesaler, nor to any person the licensed wholesaler has reason to believe will sell or supply any quantity of the light wine or beer to any retail location outside of the designated sales territory of the licensed wholesaler.

**5.** Because there are two individuals with the last name Mitchell, Manny and Adam, this court will refer to both individuals by their first names.

relationship with Cash Distributing Company. In November 2008, Mitchell became the Anheuser–Busch wholesaler in Major Mart's territory.

In September 2010, Major Mart claims that about 70–75% of its light wine and beer sales were Anheuser–Busch products. Customers, says Major Mart, would come to the B–Quik stores to purchase beer and subsequently would purchase other products such as gasoline, tobacco, and grocery items. Major Mart says that customers often have preferred beer brands, and they will not stay to buy other items if their preferred beer brand is not in stock.

In September 2010, the relationship between Major Mart and Mitchell began to deteriorate. Major Mart says Mitchell sent five different "Every Day Low Price" ("EDLP") sheets to Major Mart with differing prices. As a result of the confusing price sheets, Major Mart was unable to correctly price the Anheuser–Busch products and lost profit on its beer sales. Major Mart also asserts that Mitchell began overstocking the store with items that Major Mart did not request and charging prices different from prices charged at other stores. Mitchell, in contrast, claims that it gave accurate pricing information to Major Mart, but Major Mart ignored the updated pricing sheet and chose not to redo its pricing. Mitchell refused to compensate Major Mart for the alleged lost profits during this period.

As a result of the dispute with Mitchell, in late 2010 and early 2011, Major Mart made a business decision to provide additional display space to Mitchell's competitors, remove Anheuser–Busch displays and signs, and lower the prices on Mitchell's competitors' products. Although the cooler space allocation in five Major Mart stores remained the same, in the other stores Major Mart reduced the cooler space allocated to Anheuser–Busch prod-

ucts from approximately 55 percent to approximately 48 percent. As a result, Major Mart's sales of Coors and Miller beers increased.

In late September 2010, one of Major Mart's competitors sent an email to Mitchell, complaining that it was losing Coors and Miller business to Major Mart because of the pricing in the B–Quick stores. The competitor wanted to see if Mitchell could do anything about the situation. Mitchell claims that its members met to discuss the situation, but they ultimately chose to do nothing. Tony Carley Depo. at 65–69, docket no. 104, exh. 4. Major Mart's President, Sharp, however, claims he discovered that Mitchell's salesmen were entering the coolers and storeroom to inventory competitors' products. Sharp Depo. at 176–77,183–84, docket no. 104, exh. 1. As a consequence, in early November 2010, Major Mart informed Mitchell that Major Mart would conduct its own ordering and Mitchell's employees were not permitted in the storeroom. Id. 182–84.

Major Mart contends that Mitchell began retaliating against Major Mart. Major Mart claims that Mitchell was dissatisfied with the Anheuser–Busch shelf space in the B–Quik stores (approximately 50 percent) and wanted the shelving allocation to represent Anheuser–Busch products' market share (approximately 70 percent). Mitchell also wanted price parity with its competitors' products. Manny Depo. at 120, docket no. 104, exh. 2.

On April 11, 2011, Mitchell contacted Major Mart to inform it that Mitchell was changing its delivery days and cutting deliveries to most Major Mart stores to once per week. Major Mart asserts that Mitchell continued to provide multiple delivery days to Major Mart's competitors. Mitchell asserts that it made this change because of its twice annual evaluation of delivery routes. After evaluating the volume

on the trucks, the number of stops the truck made, and the drive time, Mitchell determined that Major Mart was selling less Anheuser–Busch beer, and once-a-week deliveries would make more business sense for Mitchell.

On April 12, 2011, Major Mart's President, Sharp, emailed Mitchell complaining that once a week deliveries would fill up Major Mart's coolers and storerooms, leaving *no room for competitor products*. Friday deliveries, continued Major Mart, would leave the store without cold beer on the "best selling day of the week;" delivery personnel would have to take longer reviewing the accounts, thus hindering other venders from doing the same; and delivering so much beer at once would obstruct customers. Sharp also filed a discrimination complaint with Anheuser–Busch regarding the situation and threatened to file a complaint with the Mississippi Department of Revenue.

Sharp repeatedly contacted Mitchell regarding any new procedures for special orders and minimum case orders. On orders from Adam, no one responded to Sharp's emails. Tony Carley Depo. at 77, docket no. 104, exh. 4. On April 15, 2011, after Sharp received no answers to his questions, Sharp informed Mitchell that Major Mart was instituting special vendor procedures for Mitchell Beverage. Vendor hours were restricted to between 6:30 a.m. and 11:30 a.m.; the vendor truck had to be parked in a specific area; Mitchell could use only two carts in the store at a time; other vendors would have priority in servicing the account; Mitchell could not enter the store if another vendor was already servicing the account; and Mitchell had to remove all boxes or trash if the store had no recycling bin.

Manny, part owner of Mitchell, sent the following message to his son Adam after reading Major Mart's new vendor rules:

He is very close to getting on my last nerve.

We don't have to even service him if we choose not to.

Let me think on this.

We could conference in some of the guys if you want to get some creative thinking on it.

Or we could tell him to go screw himself.

He is spending lots of energy on this. Our non-answers are probably totally driving him crazy! He probably expects us to bow and serve him.

The more of this shit we can give him to write, the better, I think. What a nice guy he is ...

Email, docket no. 101, exh. 33.

On April 18, 2011, Mitchell stopped delivering to Major Mart stores. Manny Depo. at 252–53, docket no. 104, exh. 2. Because Mitchell is the only wholesaler licensed to sell Anheuser–Busch products in the counties where Major Mart does business, Major Mart was without access to some of the market's best-selling beers (i.e. Budweiser and Bud Light). Major Mart asserts that Mitchell knew that its actions would result in sales losses and damage to customer loyalty.

On April 20, 2011, Major Mart filed for and obtained a Temporary Restraining Order to require Mitchell to resume its deliveries. Temporary Restraining Order, docket no. 121, exh. 2.

During the pendency of the Temporary Restraining Order, counsel for both Major Mart and Mitchell discussed a resolution to the delivery dispute. The parties seemingly reached a resolution to the dispute. Major Mart believed that Mitchell would provide two or more deliveries per week if Major Mart: (1) increased its prices on competing brands of beer to the same price as Anheuser–Busch products; (2) re-

tracted the vendor procedures; and (3) reconsidered shelf space allocation for Anheuser–Busch. Brown Affidavit, docket no. 101, exh. 53.

On June 2, 2011, after Major Mart raised its prices on other beers and dismissed its action for preliminary and permanent injunction, Mitchell demanded that Anheuser–Busch's shelf allocations be increased to the pre-September 2010 levels by June 7, 2011. Sharp Depo. at 270–71, docket no. 104, exh. 1; Letter, docket no. 121, exh. 10. Mitchell claimed that an "immediate return of September 2010 shelving was required" in their agreement. Letter, docket no. 121, exh. 10. When Major Mart declined to reallocate its shelf space by June 7, 2011, Mitchell cut deliveries to one day a week for most of Major Mart's stores. Sharp Depo. at 275, docket no. 104, exh. 1; Email, docket no. 101, exh. 34. Because of limited storage space in the stores, Major Mart says it could not order as much Anheuser–Busch beer in one order unless it chose to cut back on competing brands of beer.

On June 13, 2011, after the agreement between Major Mart and Mitchell fell apart, Major Mart instituted a new set of vendor rules, including new delivery hours. *Id.* at 276–77; Email, docket no. 101, exh. 35. Adam advised his salesmen to go to the Major Mart stores at the regularly scheduled time and "if That [sic] doesn't fit in the time window then [Sharp] can either FAX in the order by 4pm or not get beer." Email, docket no. 101, exh. 35.

Mitchell also stopped providing sales velocity reports and business reviews, which Major Mart claims Mitchell still provided to Major Mart's competitors. When Major Mart asked about the reports, it received no reply. Tony Carley Depo. at 96–97, docket no. 104, exh. 4. Major Mart says

it would use these reports when ordering beer from Mitchell, and without the reports it was more difficult for Major Mart to determine the amount to order.

Also, between June and September 2011, Major Mart began documenting sales coupons and promotional giveaways that Mitchell was providing to Major Mart's competitors. For example, some stores had text-to-win [6] and in-store drawings for Anheuser–Busch coolers, grills, golf bags, and foldable beach chairs. Some stores had coupons and mail-in rebates to give away with Anheuser–Busch beer purchases. Further, some stores received large Anheuser–Busch promotional displays and "freebies" (golf balls, beer koozies, and hats) to attract customers. Mitchell asserts that these promotional materials and coupons were provided only to stores where promotional displays were used. Major Mart, however, decided to remove the Anheuser–Busch promotional displays in in 2010.

In 2011, July 4th fell on a Monday, the usual day that Mitchell made its deliveries. Email, docket no. 101, exh. 38. Mitchell decided not to make deliveries during the holiday, which would require retailers, like Major Mart, that only receive once a week deliveries to order extra for the holiday and for the longer wait between deliveries. *Id.* Mitchell, however, did not tell Major Mart about the changed schedule until after Major Mart had ordered for the week. *Id.* As a result, Major Mart ran low on beer, and Mitchell failed to make deliveries on July 5, 2011 or July 6, 2011. Email, docket no. 101, exh. 39. When Sharp complained about the missed deliveries, Adam told his employees to ignore the email. Email, docket no. 101, exh. 40.

---

6. Text-to-win contests require the customer to send a text message, via cellphone, to a specified telephone number. The customer is entered into a drawing to win the specified item.

Major Mart also began experiencing problems with "short-dated beer[7]." On July 7, 2011, after Mitchell finally delivered beer, Major Mart allegedly discovered several packages of beer that were forty to forty-six days old. Email, docket no. 101, exh. 41. Concerned about selling expired beer, Sharp contacted Mitchell, saying that he would prefer not to receive beer older than thirty days. *Id.* Sharp also claimed that he caught Mitchell's employees trying to "swap" short dated beer on their truck for "good product" in Major Mart stores. *Id.* Mitchell denied that it was intentionally sending short dated beer, claiming that it moves beer out of its warehouse on a "first in first out basis."[8] Email, docket no. 101, exh. 43. Mitchell also informed Major Mart that it would not allow Major Mart to pick specific code dates on beer.

Major Mart requested that Mitchell take away boxes and other trash after restocking the store. Mitchell claims that it does not provide that service. Major Mart, however, provided pictures of boxes stacked in Mitchell's trucks, along with packaging labels that contain the names of Major Mart's competitors. Sharp Affidavit, docket no. 101, exh. 54.

On July 25, 2011, Mitchell again stopped delivering to Major Mart stores due to conflicts with Major Mart and Sharp. Major Mart claims this resulted in a significant loss because its B–Quik stores were without popular brands of beer just as students were returning to college. Mitchell, however, resumed deliveries on August 2, 2011, after Major Mart's attorney sent Mitchell a demand.

When disputes continued, Major Mart filed suit in this federal court on September 16, 2011. On the part of Mitchell, Major Mart alleges monopolization, price discrimination, violation of state statutes, and tortious interference with business relations.

The parties' disputes have not stopped with the filing of this lawsuit. Major Mart claims that Mitchell has continued its attempt to disrupt Major Mart's business and punish Major Mart for refusing to allow Mitchell to control beer sales at its stores. On October 31, 2011, Mitchell quit putting price stickers on beer as it had done for years. Manny Depo. at 200–01, docket no. 104, exh. 2. Mitchell refused to allow Major Mart to price the beer during the check-in process, which required Major Mart to stock its own coolers and rotate the beer in its coolers. Sharp Depo. at 340–52, docket no. 104, exh. 1.

Major Mart states that Mitchell also would arbitrarily skip deliveries and take entire orders back to its warehouse. *Id.* 448. Mitchell also began delivering damaged products and out-of-date products to Major Mart stores in April 2012, says Major Mart. Manny Depo. at 205–06, docket no. 104, exh. 2. When Sharp complained, Adam ignored him. In an April 3, 2012 email, Manny wrote to Adam as follows:

> I don't think it is right for us to continue to jump through his hoops.
>
> We should maybe create some more of our own. Aren't we still working some stores twice? Let's cut him to once.
>
> . . .
>
> His volume continues to decline. I didn't think it could slide for this long.
>
> He is such a small part of our business . . . for us to play these games with him is ridiculous.

---

7. Beer has a limited shelf-life. Beer that is close to the end of that shelf-life is considered "short-dated beer."

8. Mitchell insists that Anheuser–Busch beer is fresh for 110 days after it is "born."

might be time to skip some deliveries ... be late, just skip a day, etc.

or, quit selling him again and get dragged back into court.

. . .

What is his end game? ?

Does he ever think he will be a big deal to us?

He has to have hurt himself beyond repair with the sales losses and with the extra crap he puts us and his employees through.

His hate is costing him a lot.

It is a pain in the ass to us, but at least it is a minor irritant. To him it is with him every waking moment.

Email, docket no. 101, exh. 50.

On April 26, 2012, Manny emailed Adam and suggested that he consider not emailing directly with Sharp and, instead, run all correspondence through the attorneys to increase Major Mart's legal fees. Email, docket no. 101, exh. 52. Manny also suggested that its lawyers might include in a letter the following: "It also seems clear that since your client represents around 1% of my clients business that he is not ever going to consider paying any money to settle this." *Id.*

Eventually, Major Mart felt the need to litigate in court these matters. After instructing its attorneys to draw up a twenty-eight page complaint, and later an amended complaint of thirty-one pages, Major Mart filed this lawsuit. The defendants answered with their thirty-nine page answer and counterclaim.

In brief, Mitchell's counterclaim alleged that Major Mart and Sharp had defamed Mitchell when they accused Mitchell of selling short-dated beer and accused Mitchell's employees of stealing beer from Major Mart's coolers. Mitchell also accused Major Mart and Sharp of tortious interference with business relations when they disparaged Mitchell's product. Mitchell further accused Major Mart and Sharp of conversion when they took down the Anheuser–Busch signs and displays, but failed to return them to Mitchell. Against Major Mart, Mitchell also claimed a breach of the covenant of good faith and fair dealing due to Major Mart's refusal to cooperate in Mitchell's attempts to provide beer. Against Sharp, Mitchell claimed tortious interference with a contract due to Sharp's alleged interference with the beer servicing contract between Mitchell and Major Mart.

On June 23, 2014, this court entered an agreed order of dismissal [docket no. 96] as to Mitchell's counterclaim. The parties asked for this dismissal after they reached a confidential agreement.

## II. JURISDICTION

This court has subject-matter jurisdiction over this lawsuit pursuant to Title 28 U.S.C. § 1331[9], commonly referred to as federal question jurisdiction. "To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action." *Gully v. First Nat'l Bank,* 299 U.S. 109, 112, 57 S.Ct. 96, 81 L.Ed. 70 (1936).

Plaintiff's complaint alleges claims arising under the Sherman Antitrust Act, Title 15 U.S.C. §§ 1–7, and the Robinson–Patman Act, Title 15 U.S.C. § 13. Therefore, this court has subject-matter jurisdiction to hear those claims.

**9.** Title 28 U.S.C. § 1331 states: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Furthermore, pursuant to Title 28 U.S.C. § 1367(a) [10], this court has subject-matter jurisdiction to hear any state law claims that may be supplemental to the federal claims already alleged. This court considers plaintiff's state law claims *sub judice* to be supplemental to its federal law claims. Therefore, this court will exercise its supplemental jurisdiction over those state law claims.

## III. MOTION TO DISMISS [DOCKET NO. 12]

### A. Standard of Review

Defendants have filed a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted." When tasked with this question, this court must consider the facts in the light most favorable to the plaintiff and determines whether the complaint states a valid claim for relief. *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir.2003).

10. Title 28 U.S.C. § 1367(a) states, in its pertinent part:

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

11. Miss.Code Ann. § 27–71–349(2) states, in its pertinent part:

A licensed wholesaler designated as the licensed wholesaler for light wine or beer within a designated sales territory shall present that light wine or beer for sale to all licensed retailers within the designated sales territory without discrimination in service.

12. Miss.Code Ann. § 67–7–3 states:

The complaint, preaches the United States Supreme Court, must allege sufficient facts to give rise to a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The court "must take all of the factual allegations in the complaint as true," but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

### B. Counts V and VI

Defendants have filed a Motion to Dismiss Counts I–VII [docket no. 12]. Counts I–VII address: Major Mart's Sherman Act claims (Counts I and II); Major Mart's Robinson–Patman Act claims (Count III); Major Mart's request for injunction under the Clayton Act (Count IV); Major Mart's resort and reliance upon Miss.Code Ann. § 27–71–349 [11] (Count V); Major Mart's invocation of the Mississippi Beer Industry Fair Dealing Act, Miss. Code Ann. § 67–7–1 *et seq.*[12] (Count VI); and Major Mart's claims under the Mississippi antitrust law, Miss.Code Ann. § 75–21–1 *et seq.*[13] (Count VII).

The legislative purpose of this chapter is to provide a structure for the business relations between a wholesaler and a supplier of light wine or beer. Regulation in this area is considered necessary for the following reasons:

(a) To maintain stability and healthy competition in the light wine and beer industry in this state.

(b) To promote and maintain a sound, stable and viable system of distribution of light wine and beer to the public.

(c) To provide for the private settlement of disputes between wholesalers and suppliers of light wine or beer as an alternative to civil litigation which consumes the time and resources of the parties and the judicial system.

(d) To promote the public health, safety and welfare.

13. Miss.Code Ann. § 75–21–1 states, in its pertinent part:

A trust or combine is a combination, contract, understanding or agreement, ex-

Because the parties discuss the Sherman Act claims, Robinson–Patman Act claims, and the Mississippi antitrust claims at greater length in the Motion for Summary Judgment [docket no. 86], this court will address those claims under the summary judgment standard. *See Americable Int'l Inc. v. Dep't of Navy*, 129 F.3d 1271, 1273 n. 5 (D.C.Cir.1997) (when presented with both a motion for summary judgment and a motion to dismiss, the court may proceed under the summary judgment standard). The court, however, will address Counts V and VI under the motion to dismiss standard, as they were only raised in the Motion to Dismiss [docket no. 12].

1. **Count VI[14], The Mississippi Beer Industry Fair Dealing Act**

■ Plaintiff's claim under Count VI accuses the defendants of violating the Mississippi Beer Industry Fair Dealing Act (the "Act"). Defendants argue that this Act creates a private right of action for

suppliers and wholesalers, but does not allow retailers to enforce the provisions of the Act through civil litigation.

The Mississippi Legislature passed this Act in 1995 "to provide a structure for the business relations between a wholesaler and a supplier of light wine or beer." 1995 Miss. Laws Ch. 619 (S.B.2860), § 2; Miss. Code Ann. § 67-7-3. The Act outlines a three-tier distribution structure for beer and light wine. A supplier or manufacturer constitutes the first tier. This supplier sells to a wholesaler, which is the second tier. The retailer is the third tier, and buys beer and light wine from the wholesaler for resale to consumers. This court is persuaded that the Act and corresponding sections of the Mississippi Code do not create a private right of action for retailers to bring a lawsuit.

The Act focuses almost exclusively on the supplier and wholesaler, their responsibilities, and parameters for their conduct.

pressed or implied, between two or more persons, corporations or firms or association of persons or between any one or more of either with one or more of the others, when inimical to public welfare and the effect of which would be:
(a) To restrain trade;
(b) To limit, increase or reduce the price of a commodity;
(c) To limit, increase or reduce the production or output of a commodity;
(d) To hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity;
(e) To engross or forestall a commodity;
(f) To issue, own or hold the certificate of stock of any trust and combine within the spirit of this chapter knowing it to be such at the time of the issue or the acquisition or holding such certificate; or
(g) To place the control to any extent of business or of the proceeds or earnings thereof, contrary to the spirit and meaning of this chapter, in the power of trustees, by whatever name called; or
(h) To enable or empower any other person than themselves, their proper offi-

cers, agents and employees to dictate or control the management of business, contrary to the spirit and meaning of this chapter; or
(i) To unite or pool interest in the importation, manufacture, production, transportation, or price of a commodity, contrary to the spirit and meaning of this chapter.
Any corporation, domestic or foreign, or any partnership, or individual, or other association, or person whatsoever, who are now, or shall hereafter create, enter into, become a member of, or a party to any trust or combine as hereinabove defined shall be deemed and adjudged guilty of a conspiracy to defraud and shall be subject to the penalties hereinafter provided.

**14.** The court elects to address Count VI first because that Count deals directly with the Mississippi Beer Industry Fair Dealing Act. Count V addresses Miss.Code Ann. § 27-71-349, which was adopted as part of the Mississippi Beer Industry Fair Dealing Act, but codified in another section of the Mississippi Code.

The session law which enacted this law is, in part, entitled an act "to regulate the relationship between suppliers and wholesalers of light wine and beer." 1995 Miss. Laws Ch. 619 (S.B.2860). The definitions section defines the terms "supplier" and "wholesaler," but does not mention "retailer." 1995 Miss. Laws Ch. 619 (S.B.2860), § 3; Miss.Code Ann. § 67–7–5.

Section 11 of the Act, codified at Miss. Code Ann. § 67–7–21, creates a private right of action for a wholesaler or supplier to enforce provisions of the Act. This section reads:

(1) If a supplier or wholesaler engages in conduct prohibited under this act, either party may maintain a civil action against the other to recover actual damages reasonably incurred as the result of the prohibited conduct.

(2) A supplier or wholesaler that violates any provision of this chapter shall be liable for all actual damages and all court costs and, in the court's discretion, reasonable attorney fees incurred by the other party as a result of that violation.

(3) A supplier or wholesaler may bring an action for declaratory judgment for determination of any controversy arising pursuant to this chapter.

(4) Upon proper application to the court, a supplier or wholesaler may obtain injunctive relief against any violation of this chapter.

(5) Any legal action taken under this chapter, or in a dispute over the provisions of an agreement shall be filed in a court, state or federal, located in Mississippi, which state court is located in, or which federal court has jurisdiction and venue of, the county in which the wholesaler maintains its principal place of business in this state.

Subsection one creates a private right of action for violation of this chapter of the Mississippi Code. This subsection refers specifically to a supplier and wholesaler, but does not mention a retailer. The language says "either party," referring to the antecedent "supplier or wholesaler," "may maintain a civil action against the other." This language indicates that the wholesaler may sue the supplier or the supplier may sue the wholesaler, but does not address any rights created for a retailer.

The plaintiff relies upon the language of subsection two, which says a wholesaler or supplier may be held liable for violation of the Act. Plaintiff argues that while subsections one, three, and four of this section refer specifically to actions by a supplier or wholesaler, subsection two does not require a plaintiff to be a supplier or wholesaler. This subsection, however, is embedded in a section and a chapter of the Code which specifically addresses the rights and responsibilities of wholesalers and suppliers. The subsection immediately preceding this creates a private right of action only for suppliers and wholesalers. This subsection cannot reasonably be read in isolation from the rest of the chapter of the Code, as this chapter unmistakably shows that the intent of the legislature was to regulate the relationship between suppliers and wholesalers of light wine and beer. Therefore, this court is convinced that Major Mart, as a retailer, does not have a private right of action under the Act.

## 2. Count V, Miss.Code Ann. § 27–71–349

This statute was enacted as part of the same session law as the Beer Industry Fair Dealing Act, but it is codified in a different part of the Mississippi Code, Title 27, Chapter 71, which addresses taxation of alcoholic beverages. Taxation under this chapter is governed by the Mississippi Department of Revenue. The specific section which plaintiff complains

that defendant violated, Miss.Code Ann. § 27–71–349, may be enforced through criminal prosecution and fines. *See* Miss. Code Ann. § 27–71–347.[15]

Miss.Code Ann. § 27–71–349 requires manufacturers and importers of light wine and beer to designate sales territories for each brand it sells in Mississippi and name one licensed wholesaler for that brand in each territory. This section of the statute creates a practical monopoly for the wholesaler with respect to a particular brand of beer or light wine, because the retailer may not purchase that brand from any other wholesaler. It does not limit competition between wholesalers, which sell different brands of beer or light wine.

The statute requires the licensed wholesaler to "present that light wine or beer for sale to all licensed retailers within the designated sales territory without discrimination in service." Miss.Code Ann. § 27–71–349(2). Major Mart complains that the defendants have discriminated between it and other retailers in the provision of service.

■ Defendants say that this claim must be dismissed because the statute creates no private right of action and must be enforced by the Mississippi Commissioner of the Department of Revenue by revoking or suspending a wholesaler's license.

■ To find that a statute creates a private right of action for a particular plaintiff, the court must examine the statutory language to determine if the legislature intended for individuals to be able to sue under that statute. *Tunica Cnty. v. Gray*, 13 So.3d 826, 829 (Miss.2009). If the statutory language explicitly grants the right to sue, the inquiry ends there. If the statutory language does not provide a clear answer as to whether the legislature intended to create a private right of action, the court may look to legislative history, the statute's "historical background, its subject matter, and the purposes and objects to be accomplished." *Id.* at 830 (internal citations omitted).

The Mississippi Legislature granted the Commissioner of the Department of Revenue the power to enforce Miss.Code Ann. § 27–71–349 by revoking or suspending a wholesaler's license. Miss.Code Ann. § 67–3–29 [16]. The Legislature thus expressly committed the power to enforce the statute to the Commissioner, and the Commissioner's exercise of that power may not be overturned unless it is arbitrary and capricious. *See Stone v. Farish*, 199 Miss. 186, 23 So.2d 911 (1945); *Powell*

**15.** Miss.Code Ann. § 27–71–347 states:

Except as otherwise provided in this article, any person who violates any provision of this article, or any rule or regulation promulgated by the commissioner under authority of this article, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not more than Five Hundred Dollars ($500.00), or by imprisonment in the county jail for not more than six (6) months, or by both such fine and imprisonment, in the discretion of the court. Any person convicted of violating any of the provisions of this article, or any rules or regulations promulgated by the commissioner under authority of this article, shall forfeit his permit, and shall not

thereafter be permitted to engage in any business taxable under the provisions of this article.

**16.** Miss.Code Ann. § 67–3–29(2) states, in its pertinent part:

If any person exercising any privilege taxable under the provisions of Chapter 71 of Title 27, Mississippi Code of 1972, shall willfully neglect or refuse to comply with the provisions of such chapter, or any rules or regulations promulgated by the commissioner under authority of such chapter, or the provisions of this chapter, ... the commissioner shall be authorized to revoke or suspend the permit theretofore issued to the person.

*v. State Tax Comm'n,* 233 Miss. 185, 101 So.2d 350 (1958). Put simply, the statutes and regulations governing beer wholesalers, including Miss.Code Ann. § 27–71–349, are "conditions attached to [the] exercise" of a "legislative privilege" to be enforced by the Commissioner, not a source of tort law to be invoked by private litigants such as Major Mart. *Stone,* 23 So.2d at 913.

## IV. SUMMARY JUDGEMENT [DOCKET NOS. 86 AND 113]

### A. Standard of Review

The court should grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 343 (5th Cir.2007). A fact is material if "it might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To determine whether there is a genuine dispute as to any material fact, the court must consider "all of the evidence in the record but refrain from making any credibility determinations or weighing the evidence." *Turner,* 476 F.3d at 343 (*citing Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). The court must make all reasonable inferences in favor of the non-moving party, "however, a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Reeves,* 530 U.S. at 150, 120 S.Ct. 2097 (*citing Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)).

### B. Sherman Act Claims

In Count I and Count II of its complaint, Major Mart contends that Mitchell Beverage and Mitchell Distributing have engaged in monopolization in violation of the Sherman Act, Title 15 U.S.C. §§ 1–7 [17], and have attempted to engage in monopolization in violation of the Sherman Act. Count VII also pursues monopolization claims under Mississippi's antitrust law, Miss.Code Ann. § 75–21–1.[18] Courts have analyzed Mississippi's antitrust law in the same manner as federal antitrust laws. *Walker v. U–Haul Co. of Miss.,* 734 F.2d 1068, 1070 n. 5 (5th Cir.1984); *Hardy Bros. Body Shop, Inc. v. State Farm Mut. Auto. Ins. Co.,* 848 F.Supp. 1276, 1290 (S.D.Miss.1994).

Major Mart claims that Mitchell used its market power to "strong arm" retailers into favorably pricing and displaying Anheuser–Busch products at the expense of its competitors' products. Mitchell argues that it cannot be held liable under the Sherman Act because of the "State Action Doctrine." In the alternative, Mitchell argues that there is no evidence of interstate commerce, and Major Mart has not met its burden of proof on the claims of monopolization. Further, Mitchell Beverage con-

---

**17.** Title 15 U.S.C. § 2 states:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

**18.** *Supra,* note 13.

tends that there is no evidence of an antitrust injury.

### 1. State Action Doctrine

██ The United States Supreme Court first articulated the State Action Doctrine in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In that case, the United States Supreme Court held that the Sherman Act's antitrust laws did not apply to states acting in their capacities as sovereigns. *Id.* at 352, 63 S.Ct. 307. The immunity granted by the State Action Doctrine applies to private parties if those parties' anticompetitive actions are the product of state regulation. *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 292 (5th Cir.2000). To gain such immunity, the defendant must demonstrate that the challenged restraint is (1) "clearly articulated and affirmatively expressed as state policy" and (2) "actively supervised by the State." *Ca. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

██ Mitchell argues that Mississippi's regulatory scheme relating to the distribution of alcoholic beverages satisfies both prongs of the State Action Doctrine. First, Mississippi law prevents additional competition by requiring every beer supplier to designate only one licensed wholesaler for each sales territory and by prohibiting licensed wholesalers from selling to any retailer outside of their designated territories. Miss.Code Ann. § 27–71–349. The statute also prohibits that wholesaler from any discrimination in its service of alcoholic beverages. *Id.* Mitchell claims that it does not "restrain other wholesale distributors" from entering the market, as alleged by Major Mart. These alleged restraints, says Mitchell, are a necessary component of Mississippi's three-tier distribution system. Secondly, Mitchell contends that Mississippi supervises this system by making sure that no wholesaler sells outside of its territory or discriminates against retailers. Miss.Code Ann. § 27–71–349.

██ Major Mart disputes Mitchell's argument. First, Major Mart contends that there is no clearly articulated and affirmatively expressed state policy to replace inter-brand competition between beer wholesalers. In *Fed. Trade Comm'n v. Phoebe Putney Health Sys., Inc.*, —— U.S. ——, 133 S.Ct. 1003, 1011, 185 L.Ed.2d 43 (2013), the United States Supreme Court reminded the courts that when the activity is carried out by a non-state actor, pursuant to state authorization, the court must scrutinize the activity more closely. *Id.* at 1010. To receive immunity under the State Action Doctrine, the anticompetitive activity must be "undertaken pursuant to a clearly articulated and affirmatively expressed state policy to displace competition." *Id.* at 1011 (internal quotations omitted). To be "clearly articulated" the anticompetitive effect need only be the foreseeable result of the state authorized policy. *Id.*

Miss.Code Ann. § 27–71–349 clearly restricts competition between distributors of the same beer brands and restricts retailers' ability to choose alternative wholesalers from which to purchase particular brands of beer. The law, however, does not restrict competition between wholesalers of different brands of beer. In other words, the law does not prevent one wholesaler of a specific brand or brands of beer from attempting to monopolize the market. Major Mart avers that it is not attacking the statutory beer distribution system; rather, it is attacking the defendants' predatory actions that are designed to maintain market share and market power with respect to wholesalers of *competing* beer brands.

Major Mart asserts that no Mississippi statute or regulation, either expressly or by implication, allows a beer wholesaler to use its market power to try to force retailers to buy a particular volume of beer, to sell beer at particular prices, or to dictate how the retailer allocates its shelf space. Major Mart also asserts that no Mississippi statute or regulation, either expressly or by implication, restricts competition between wholesalers who sell competing brands of beer and light wine.

This court is satisfied that Major Mart complains of anti-competitive activities separate from Mississippi's statutory beer distribution system. Miss.Code Ann. § 27–71–349 only restricts intra-brand competition; it does nothing to regulate inter-brand competition. Therefore, this court is satisfied that the State Action Doctrine is inapplicable.

### 2. Interstate Commerce

■ The Sherman Act does not reach all alleged monopolies or attempted monopolies but only those that concern "any part of the trade or commerce *among* the several States, or with foreign nations." Title 15 U.S.C. § 2 (emphasis added). The Sherman Act does not apply "unless the relevant aspect of *interstate* commerce is identified; it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce." *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). Cases have held that although "wholly local business restraints can produce the effects condemned by the Sherman Act," the restraint must "substantially and adversely affect[ ] interstate commerce." *Hosp. Bldg. Co. v. Rex Hosp. Trustees,* 425 U.S. 738, 743, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

■ Commerce falling within the reach of Sherman Act jurisdiction should involve an "appreciable amount of commerce." *McLain,* 444 U.S. at 245, 100 S.Ct. 502. In making a jurisdictional determination under the Sherman Act, the court should evaluate the impact of the restraint at issue on any other participants and potential participants in the relevant market that the restraint is likely to reach. *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 332–33, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991).

Mitchell contends that this consideration is relevant here, where the alleged restraint at issue is not directed toward the market as a whole. Mitchell's alleged actions, instead, focus on a single company that, during the relevant period, operated eleven convenience stores in northeast Mississippi. Mitchell suggests that the lack of impact on other market participants is a relevant factor in determining whether Sherman Act jurisdiction exists. Mitchell also argues that Major Mart does not have any evidence that the defendants directed any of the alleged conduct either to the market as a whole or to any other retailer.

Major Mart contends that it has proven a substantial effect on interstate commerce. In exploring this premise, this court recognizes that jurisdiction under the Sherman Act extends to the furthest reach of the Commerce Clause. *Id.* at 329, 111 S.Ct. 1842. Major Mart need not "quantify the adverse impact of the defendant's conduct," but only plausibly allege a sufficient effect on interstate commerce. *Burke v. Ford,* 389 U.S. 320, 321, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967).

Mississippi has no Anheuser–Busch breweries. As a result, all Anheuser–Busch products must travel in interstate commerce to reach Mitchell and to be sold

to retailers like Major Mart. Other courts have found similar circumstances sufficient under the Sherman Act, provided that the in-state actions impact interstate commerce. *Id.* (liquor wholesalers who imported liquor into the state violated the Sherman Act, even though all of their sales were intrastate, because the wholesaler's actions "invariably reduce[d] competition"); *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934, 948–49 (5th Cir. 1975) (finding that shipments of beer into the state, approximately $20 million worth, were substantial and the company's policy on pricing and distribution of its products sufficiently impacted interstate commerce); *Greenhaw v. Lubbock Cnty. Beverage Ass'n*, 721 F.2d 1019, 1031 (5th Cir.1983) (overruled on other grounds by *Int'l Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir.1986) ("Congress could, if it chose, employ the Commerce Clause to prohibit local price-fixing of a product which is all imported from other states, albeit by means of a middleman wholesaler located in the same state as the price-fixing retailer")); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (restaurant owner's purchase of approximately $70,000.00 of meat from a local supplier, who purchased the meat outside of the state, was sufficient to subject the owner to legislation adopted pursuant to the Commerce Clause). Major Mart contends that the Mitchell's business tactics impact interstate commerce by increasing the import and sale of Anheuser–Busch products at the expense of wholesalers who sell competing brands.

Major Mart also asserts that Mitchell's attempts to restrict delivery of beer to Major Mart affect interstate commerce by reducing the sale of other items that move in interstate commerce including tobacco, food, and gasoline. In support, Major Mart points to *Copper Liquor v. Adolph Coors Co.*, 506 F.2d at 934.

In *Copper* a single retailer filed a Sherman Act claim against Coors, alleging that the brewing company conspired to discontinue the plaintiff's supply of Coors beer when the plaintiff sold the beer below retail price. *Id.* at 936. In particular, the Fifth Circuit held that evidence that "the unavailability of Coors at a retail outlet led to a diminution in demand *for other products on sale at that outlet that moved in interstate commerce*" was a sufficient effect on interstate commerce. *Id.* (emphasis added) (citing *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26, 34–36 (5th Cir.1972) (plaintiff retailer sold other products that moved in interstate commerce, in addition to gasoline, the product restrained by the defendant's conduct)).

Further, Major Mart disputes Mitchell's contention that its actions could have little effect on interstate commerce because Major Mart is only a single retailer with only eleven stores. In *Klor's, Inc. v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 210–11, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the wholesaler defendants contended they had not violated the Sherman Act when they refused to sell their products to a single retailer, despite selling to the retailer's competitors. The United States Supreme Court disagreed and held that the defendants' monopolistic conduct against a single local retailer constituted a Sherman Act violation:

> [Monopolistic conduct] is not to be tolerated merely because the victim is just one merchant whose business is so small that his destruction makes little difference to the economy. Monopoly can as surely thrive by the elimination of such small businessmen, one at a time, as it can by driving them out in large groups.

*Id.* at 213, 79 S.Ct. 705. Similarly, in *Summit Health, Ltd. v. Pinhas*, 500 U.S.

at 331, 111 S.Ct. 1842, the United States Supreme Court determined that a conspiracy to exclude a single physician from practicing in a single Los Angeles, California hospital would have a sufficient effect on interstate commerce because "as a matter of practical economics there will be a reduction in the provision of ophthalmological services in the Los Angeles market."

■ This court is persuaded that Major Mart has established the interstate commerce requirement under the Sherman Act. The beer in question must travel in interstate commerce to arrive in Mississippi retail stores. Further, restrictions on the sale of beer affect the sale of other products that are sold in interstate commerce. This court is not dissuaded in its finding of interstate commerce simply because Major Mart is a small retailer. The United States Supreme Court has held that monopolistic conduct against a single individual can have a sufficient effect on interstate commerce to satisfy the Sherman Act.

### 3. Monopolization

■ To prevail on a claim of monopolization under the Sherman Act, the plaintiff must prove that the defendant (1) possesses monopoly power (2) in the relevant market, and (3) the defendant has willfully acquired, maintained or enhanced that market power by exclusionary conduct. *United States v. Grinnell Corp.* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

### a. Relevant Market

■ The relevant market is defined by the product market [19] and the geographic market in which the sellers of the product compete. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

Major Mart's expert, Dr. David Sharp ("Dr. Sharp") [20], opines that the relevant geographic market is the areas served by Mitchell from its Tupelo, Mississippi and Columbus, Mississippi warehouses and the counties where Major Mart's stores are located: Union County, Lee County, Chickasaw County, Monroe County, Clay County, Lowndes County, and Oktibbeha County. Dr. Sharp Expert Report ¶ 39–42, docket no. 104, exh. 6. Dr. Sharp also opines that the relevant product market is beer at the wholesale distribution level. *Id.* at ¶ 29. Mitchell does not dispute Dr. Sharp's description of the relevant market.

### b. Monopoly Power

■ Monopoly power is the "power to control prices or exclude competition." *Grinnell Corp.*, 384 U.S. at 571, 86 S.Ct. 1698. Dr. Sharp opines that the defendants possess monopoly power in the relevant market. Dr. Sharp Expert Report ¶ 27, docket no. 104, exh. 6. Dr. Sharp also states that Mitchell controls approximately 73.5% of the relevant market. *Id.* at ¶ 43.

■ Monopoly power can be proven by direct evidence or circumstantial evidence, such as market share and barriers to entry. *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 107 (2d Cir.2002). According to Major Mart, a market share in excess of 70 percent generally is accepted as *prima facie* evidence of market power. *See, e.g., E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 450–51 (4th Cir.2011) (market share in excess of 70 percent warrants inference of market power); *In re Educ. Testing Serv.*, 429 F.Supp.2d 752, 756 (E.D.La.2005) (market share of great-

19. The product market includes both the product in question and reasonably interchangeable products.

20. No relation to Major Mart's President, Greg Sharp.

er than 70 percent generally sufficient to establish market power). Mitchell admits that its market share is between 70 and 75 percent.

Major Mart also asserts that there are significant barriers to entry of new competitors to the market. Major Mart points to Mississippi's statutory system of beer distribution, which makes it difficult for new beer distributors to enter the market. Miss.Code Ann. § 27–71–349 requires every manufacturer of beer to designate sales territories for each of its brands sold in Mississippi and to name one licensed beer wholesaler in each territory to be the licensed wholesaler for the manufacturer's brands. *See* Miss.Code Ann. § 27–71–349(1).

Mitchell disputes Major Mart's contention that it possesses monopoly power. Mitchell claims that Major Mart has not demonstrated that the defendants' competitors are so capacity constrained as to prevent them from making more sales when the opportunity presents itself. Mitchell also notes that when Major Mart lowered the price on Coors and Miller products in its stores, Major Mart's sales on those beers increased.

Further, Mitchell asserts that Major Mart has not provided any evidence of how Mitchell's alleged actions have affected the competition for beer at the wholesale distribution level. Instead, Major Mart acknowledges that it does not know of any instances, other than its own experiences, in which Mitchell has attempted to influence *any* retailer into obtaining more space.

This court is persuaded that a question of fact exists as to whether Mitchell has monopoly power. Mitchell controls over 70 percent of the beer market and elements of its conduct with Major Mart suggest attempts to maintain that market share. These facts, combined with the high barriers to entry, create a question of fact as to the existence of monopoly power, which must be resolved by the trier of fact.

### c. Exclusionary Conduct

"The mere possession of monopoly power ... is not only not unlawful; it is an important element of the free-market system." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). The court will not find monopoly power unlawful "unless it is accompanied by an element of anticompetitive conduct." *Wireless Commc'ns, L.L.C. v. AT & T, Inc.*, 893 F.Supp.2d 789, 813 (N.D.Miss.2012). Conduct that has a legitimate business justification is less likely to be predatory, but pretextual justifications for predatory conduct will not insulate the defendant from liability. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 484, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

According to Major Mart, the evidence shows that when Major Mart decided in September 2010, to promote lower prices for Coors and Miller beer, Mitchell retaliated. When one of Major Mart's competitors complained to Mitchell about losing sales of Coors and Miller to Major Mart and asked what Mitchell could do to help them, Mitchell's salesmen took inventory of Coors and Miller beer in Major Mart coolers. In April 2011, Mitchell reduced the number of deliveries to once per week to many Major Mart stores. This reduction in deliveries required Major Mart to either order less beer from Mitchell or less beer from Mitchell's competitors because of insufficient storage space. Mitchell also proposed making weekly deliveries on Fridays to most stores, which would cause Major Mart to have no cold beer available for sale on Fridays and Saturdays, the busiest sales days of the

week. Further, Mitchell intentionally refused to respond to Sharp's concerns and ceased delivering to some stores all together. Mitchell also cut off sales support to Major Mart stores and provided Major Mart's competitors with coupons and rebates, which were not offered to Major Mart. Mitchell, then, allegedly delivered damaged product to Major Mart stores and refused to make deliveries if Major Mart would not accept damaged or short-dated product.

These actions, says Major Mart, were intentionally designed to punish Major Mart for trying to sell other brands of beer. Major Mart points to *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir.2005). In that case, the manufacturer of dental products with a 75 to 80 percent share of the market was found to violate Section 2 of the Sherman Act when it imposed an exclusive agreement on dental suppliers, requiring them to buy only from Dentsply. The court recognized that exclusive dealing agreements are not necessarily illegal, but such agreements can be an improper means of maintaining a monopoly. *Id.* at 187. The court found that Dentsply intentionally used the agreements to foreclose competition and that its stated business reasons for the agreements were pretextual. *Id.* at 196–97. Like Dentsply, Major Mart contends that Mitchell has used its market power and exclusive right to sell Anheuser–Busch products to punish Major Mart for trying to sell competitors' beer.

Mitchell, disagreeing, says that there is no evidence that it used its alleged market power (1) to try and force retailers to buy a particular volume of beer, (2) to sell its beer at particular prices, or (3) to dictate how the retailer allocates its shelf space. Mitchell notes that Major Mart orders its own beer, sets the retail beer prices, lowers its prices on competitors' beer, and allocates space on its shelves and in its coolers.

Again, this court finds that sufficient questions of fact exist to warrant denial of the motion for summary judgment. The question is whether Mitchell's conduct was intended to punish and exclude Major Mart for promoting competing beer, and thereby maintain monopoly power; or whether Mitchell's conduct was, as it says, the result of a legitimate business decision. This question will require the trier of fact to weigh the testimony, and cannot be appropriately resolved in a summary judgment motion.

### 4. Antitrust Injury

Section 2 of the Sherman Act, which prohibits monopolies and attempted monopolies "does not explicitly require a plaintiff to prove an injury to competition; the plaintiff must prove only the existence of monopoly power and the willful continued maintenance of that power." *Walker v. U–Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (1984). Harm to competition is presumed by proof of the elements of monopolization. *Id.* The plaintiff, however, must still establish "standing" by proving the existence of an antitrust injury. *Id.*

United States Supreme Court has defined an antitrust injury as follows:

[An] injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the *anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.* It should, in short, be "the type of loss that the claimed violations ... would be likely to cause.

*Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The antitrust injury

should be "a direct consequence of the alleged antitrust violation" and the injury must be real, not speculative. *Walker,* 747 F.2d at 1014. Furthermore, the "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir.1997).

This court already has determined that Major Mart has presented sufficient evidence to survive a motion for summary judgment on its monopolization claims. The court, therefore, presumes the existence of injury to competition. The court now turns to the question of antitrust injury.

Major Mart points to *Walker,* 747 F.2d at 1011, to support its claim of an antitrust injury. In *Walker,* the plaintiff was a local trailer dealer in Jackson, Mississippi, and leased trailers at the retail level as an agent of U–Haul. *Id.* at 1014. Walker was not a direct competitor of U–Haul. *Id.* Walker alleged that his business was destroyed by U–Haul's attempt to monopolize the trailer rental business in the Jackson market, even though other companies who offered rentals in competition with U–Haul, such as Ryder and Hertz, were the alleged targets of the monopolization. *Id.* The court found that Walker's damages were distinct from those of the wholesalers: Walker's damages were for loss of business while U–Haul's wholesale competitors' damages would be for lost opportunity. *Id.* at 1014.

Major Mart says it has suffered an antitrust injury because Mitchell's allegedly predatory and anticompetitive conduct has deprive Major Mart's stores of Anheuser–Busch beer. In support, Major Mart presents the regression analysis of its expert, Dr. Sharp. Dr. Sharp's analysis demonstrates Major Mart's alleged damages from Mitchell's alleged antitrust conduct. Furthermore, as in *Walker,* Major Mart claims that its damages are separate and distinct from any damages that Mitchell's wholesale competitors could raise if they were to assert their own claim of monopolization and attempt to monopolize.

Mitchell, of course, contends that Major Mart has suffered no antitrust injury. The defendants assert that it is not enough for Major Mart to "show ... merely an 'injury causally linked' to a competitive practice; [Major Mart] 'must prove antitrust injury, which is to say injury of the type other antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *NicSand, Inc. v. 3M Co.,* 507 F.3d 442, 450 (6th Cir.2007) (quoting *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690). Defendants also contend that Major Mart's focus on its own injury is misguided because antitrust laws are designed to protect competition, not competitors. *Brunswick Corp.,* 429 U.S. at 488, 97 S.Ct. 690.

Much of the disagreement between Mitchell and Major Mart on the issue of antitrust injury revolves around the regression analysis and methodology of Major Mart's expert, Dr. Sharp. Major Mart asserts that its expert's analysis and methodology are proper. Mitchell and its experts assert that Dr. Sharp's analysis and methodology are flawed. This court will carry the issue to trial, at which time both sides may present their evidence to the trier of fact.

## C. Robinson–Patman Act Claim

In Count III of its complaint, Major Mart alleges that Mitchell has engaged in price discrimination in violation of the Robinson–Patman Act, Title 15 U.S.C.

§ 13.[21] Major Mart claims that Mitchell unlawfully discriminated against Major Mart in the course of interstate commerce by granting discounts, promotions, special services, and rebates to other retailers, but not to Major Mart.

In response, Mitchell argues that Major Mart's Robinson–Patman Act claim must fail because Major Mart has not satisfied the "in commerce" requirement of the Act. Major Mart contends that the "in commerce" requirement is satisfied because the rebates and coupons Mitchell provided to Major Mart's competitors must be redeemed in interstate commerce. Mitchell, however, contends that there must be an actual sale in interstate commerce to satisfy the "in commerce" requirement.

The United States Congress passed the Robinson–Patman Act in 1936, amending § 2 of the Clayton Antitrust Act. The Act has been codified in Title 15 U.S.C. §§ 13, 13a, 13b, and 13c. The purpose of the Robinson–Patman Act is to curb direct and indirect price discrimination. *See Fed. Trade Comm'n v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). Previously, large sellers were able to provide preferential prices and other concessions to preferred customers. *Id.* Likewise, large chain stores were able to demand preferential pricing and other concessions from sellers by virtue of their market share. *Id.* In response to these discriminatory actions in the marketplace, "Congress chose to deter such indirect price discrimination by prohibiting the granting of sales promotional allowances to one customer unless accorded on proportionally equal terms to all competing customers." *Id.* at 352, 88 S.Ct. 904.

At issue in this case are Title15 U.S.C. §§ 13(d) and (e). Title 15 U.S.C. § 13(d) prohibits the seller from paying or providing allowances to the customer for services or facilities provided by the customer if those same payments and allowances are not available to all customers:

> It shall be unlawful for *any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce* as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other

**21.** Title 15 U.S.C. § 13 states, in its pertinent part:

(d) Payment for services or facilities for processing or sale It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all

other customers competing in the distribution of such products or commodities.

(e) Furnishing services or facilities for processing, handling, etc. It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

customers competing in the distribution of such products or commodities.

(emphasis added).

Title 15 U.S.C. § 13(e) prohibits the seller from providing services, facilities, or other allowances to one purchaser if those same services, facilities, or other allowances are not made available to all purchasers:

> It shall be unlawful for *any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale,* with or without processing, *by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities* connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

(emphasis added).

Courts have traditionally defined "services or facilities" as "those relating to promotional favors," such as advertising and merchandising. *See L & L Oil Co. v. Murphy Oil Corp.,* 674 F.2d 1113, 1119 (5th Cir.1982). The Federal Trade Commission has identified the following as examples of promotional services and facilities covered by § 13(d) and (e): cooperative advertising; handbills; demonstrators and demonstrations; catalogues; cabinets; displays; prices or merchandise for conducting promotional contests; and special packaging sizes. 16 C.F.R. 240.7.

Legal scholars also have complained about the drafting of §§ 13(d) and (e). One scholar described §§ 13(d) and (e) as one of "the best example to be found anywhere of the ineptitude of statutory draftsmanship." William H. Fisher, *Sections 2(d) and (e) of the Robinson–Patman Act: Babel Revisited,* 11 VAND. L. REV. 453, 467 (1958). The confusion principally arises from the fact that these sister sections do not contain parallel language. Hugh C. Hansen, *Robinson–Patman Law: A Review and Analysis,* 51 FORDHAM L.REV. 1113, 1161 (1983).

Further, § 13(e) contains no reference to "interstate commerce." Courts, however, have concluded that this omission was inadvertent and have stated that the "jurisdictional bases" of § 13(a)—that the "defendant seller be 'engaged in commerce' and that the discrimination occur 'in the course of such commerce' "—are incorporated into § 13(e). *L & L Oil Co.,* 674 F.2d at 1116; *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 881 (9th Cir.1982); *Elizabeth Arden, Inc. v. Fed. Trade Comm'n,* 156 F.2d 132, 134 (2d Cir.1946). The Federal Trade Commission's regulations also require the seller accused of a § 13(e) violation to be "engaged in interstate commerce." 16 C.F.R. § 240.2(b)(2).

Courts have interpreted the "in commerce" requirement of the Robinson–Patman more narrowly than the Sherman Act. *Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 194, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). The Sherman Act "is keyed directly to effects on interstate markets," as evidenced by its language, which prohibits "restraint of trade or commerce among the several States." *Id.;* Title 15 U.S.C. § 1. In contrast, the language of the Robinson–Patman Act prohibits "any person engaged in commerce, in the course of such commerce, to discriminate" in price or the provisions of services. *Id.* Thus, an effect on interstate commerce is not enough, the discrimination must occur in interstate commerce.

The Fifth Circuit already has held that § 13(a)'s "in commerce" requirement is not satisfied unless the sales actually cross a state line. *Cliff Food Stores, Inc. v. Kroger, Inc.,* 417 F.2d 203, 209 (5th Cir.1969). The Fifth Circuit, as stated above, has

held that the jurisdictional "in commerce" requirement of § 13(a) is incorporated into §§ 13(d) and (e). *L & L Oil Co. v. Murphy Oil Corp.*, 674 F.2d 1113, 1116 (5th Cir.1982). The question, therefore, is whether the allegedly discriminatory promotions, forbidden by §§ 13(d) and (e), must accompany an interstate sale, or whether it is sufficient that allegedly discriminatory promotions are redeemed in interstate commerce. The confusion that gives rise to this question results from the lack of clarity in the sections as to what must occur in interstate commerce for the sections to apply.

 When a statute is ambiguous, the court may turn to the legislative history and other sources to determine the legislative intent. *West v. Kerr–McGee Corp.*, 765 F.2d 526, 530 (5th Cir.1985). As this court has found latent ambiguities in the "in commerce" requirement, this court turns to the legislative history.

Congressman Hubert Utterback, Chairman of the House Conferees, presented the conference report and explained §§ 13(d) and (e) as follows:

### SERVICES OR FACILITIES PAID FOR

The bill prohibits the seller from paying the customer for services or facilities furnished by the latter in connection with the seller's goods unless such payment is available on proportionally equal terms to all other competing customers. The existing evil at which this part of the bill is aimed is, of course, the grant of discriminations under the guise of payments for advertising and promotional services which, whether or not the services are actually rendered as agreed, results in an advantage to the customer so favored as compared with others who have to bear the cost of such services themselves. The prohibitions of the bill, however, are made intentionally broader than this one sphere in order to prevent evasion in resort to others by which the same purpose might be accomplished, and it prohibits payment for such services or facilities whether furnished "in connection with the processing, handling, sale, or offering for sale" of the products concerned.

### SERVICES AND FACILITIES FURNISHED

The bill also prohibits the seller from furnishing services or facilities to the purchaser in connection with the processing, handling, or sale of the commodities concerned unless they are accorded to all purchasers on proportionally equal terms. Again, the last phrase has reference to the several purchasers' equipment and ability to satisfy the terms upon which the offer is made, or the services or facilities furnished to any other purchaser.

There are many ways in which advertising, sales, and other services and facilities may be either furnished or paid for by the seller upon terms that will at once satisfy the requirements of the bill concerning equitable treatment of all customers and at the same time the legitimate business needs of both the seller and the purchaser.

80 CONG. REC. 9418–9419 (1936).

In 1963, Congressman Wright Patman ("Congressman Patman"), co-author of the Robinson–Patman Act, wrote a treatise on his namesake legislation: WRIGHT PATMAN, COMPLETE GUIDE TO THE ROBINSON-PATMAN ACT (1963). In the chapter dealing with §§ 13(d) and (e), Congressman Patman emphasized the language in the statute that requires the seller to be engaged in interstate commerce:

Subsection [13(d) ] specifically is limited in its application to payments made to a customer with whom the seller deals in

the course of interstate commerce. Subsection [13(e)] does not contain that limitation. The apparent inconsistencies in subsections (d) and (e) regarding "commerce" have been erased, and both have been considered broad enough to cover all the situations as long as it can be shown that the goods purchased by "either or any" of the competing customers were sold in interstate commerce. *Id.* at 132. Congressman Patman concluded that "it is sufficient to support the charge if it is shown that one or more of the purchases either bought from the person charged in interstate commerce or ... utilized the furnishing of such services in resales in interstate commerce." *Id.* at 133. Congressman Patman, therefore, reaches the conclusion that §§ 13(d) and (e) require an interstate sale.

Such a conclusion is not in conflict with Fifth Circuit precedent in *Shreveport Macaroni Mfg. v. Fed. Trade Comm'n*, 321 F.2d 404 (5th Cir.1963). In that case, the manufacturer, Shreveport Macaroni, sold its product to wholesalers in Louisiana, Texas, Arkansas, Mississippi, Tennessee, and Oklahoma. *Id.* at 405–06. Shreveport Macaroni was accused of violating § 13(d) when it provided an allowance for advertising to two grocery store chains in Louisiana, but did not offer the same allowance to other stores. *Id.* at 406. While one of the grocery store chains was headquartered in Shreveport, Louisiana, the other was headquartered in Houston Texas. *Id.* Both grocery store chains, however, operated stores in Louisiana and Texas. *Id.* at 406–07. While Shreveport Macaroni only sold its products to the Louisiana stores of these two grocery store chains, one of the chains would ship the product to its stores in Texas. *Id.* at 407. The court concluded that this shipment of the product to Texas satisfied the interstate commerce requirement. *Id.* at 408.

Although the court concluded it had jurisdiction because the product receiving the advertising allowance crossed state lines, the court suggested, in dicta, that such a strict requirement was not necessary. *Id.* The Fifth Circuit stated that the facts of the case provided sufficient evidence of interstate commerce:

> The discrimination here was in the course of interstate commerce. It ran from one engaged in interstate commerce to others engaged in interstate commerce. It favored interstate chain operators in their whole business including their intrastate competition with grocerymen in Louisiana in the sale of Petitioner's products who were not offered allowances on proportionally equal terms. The allowances were effected through the utilization of interstate mechanisms.... *We do not read the statute [to] qualify payment in the 'course of * * * commerce,' once that appears, by a further requirement that the payment be in connection with goods sold in interstate commerce, resold in interstate commerce, or that the competition between competing customers be in interstate commerce where there is ample nexus to interstate commerce in the whole transaction as here.*

*Id.* at 408–09 (emphasis added).

The Fifth Circuit did not conclude, as Major Mart suggests, that it is unnecessary for an interstate sale to accompany the discriminatory advertising allowance. The Fifth Circuit, instead, concluded that the "in commerce" requirement was satisfied if (1) the goods were sold or resold in interstate commerce; or (2) the goods were sold to those who compete in interstate commerce. *Id.*

Major Mart has presented no evidence that the beer in question was sold or resold in interstate commerce. Once the beer came to rest in Mitchell's warehouses,

it ceased to be in interstate commerce. *Walker Oil Co. v. Hudson Oil Co. of Mo.,* 414 F.2d 588, 590 (5th Cir.1969) (where merchants purchase goods to sell to the general public, the flow of interstate commerce ends when the goods come to rest within the state). Any sale to retailers, therefore, was an intrastate sale. *Id.* Nor can Major Mart demonstrate that it competed in interstate commerce. Major Mart's competitors, who received rebates and coupons from Mitchell, are located within the state of Mississippi.

Furthermore, the Ninth Circuit has held that §§ 13(d) and (e) require an interstate sale. In *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d at 874, a retail record and tape store complained that distributors provided lower prices and other allowances to retail chain stores that were not provided to single stores like the plaintiff. The plaintiff argued that because neither § 13(d) nor § 13(e) contained § 13(a)'s "purchases ... in commerce" language, those sections did not require an interstate sale. The Ninth Circuit rejected this argument, noting that "in general[,] cases have concluded that sections [13(d) and (e) ] have the same jurisdictional limitation [an interstate sale] as section [13(a) ]." *Id.* at 882.

This court is not persuaded that the redemption of rebates and coupons in interstate commerce is sufficient to satisfy the Robinson–Patman Act's "in commerce" requirement. Therefore, this court dismisses Major Mart's claim under Title 15 U.S.C. §§ 13(d) and (e).

### D. Tortious Interference Claim

■ In Count VIII of its complaint, Major Mart alleges that Mitchell has intentionally, willfully, maliciously, and tortiously interfered with Major Mart's lawful business relations by failing to supply Major Mart with beer, thus diverting existing and prospective customers and business opportunities away from Major Mart. Major Mart contends that Mitchell acted without any right or justifiable cause, and those acts resulted in financial loss and injury to business.

■ There are four elements necessary to prove a claim of tortious interference with business relations:

(1) The acts were intentional and willful;

(2) The acts were calculated to cause damage to the plaintiffs in their lawful business;

(3) The acts were done with the unlawful purpose of causing damage and loss, without right or justifiable cause on the part of the defendant (which constitutes malice);

(4) Actual damage and loss resulted.

*MBF Corp. v. Century Bus. Comm'ns, Inc.,* 663 So.2d 595, 598 (Miss.1995).

Major Mart claims that Mitchell intentionally and willfully acted against plaintiff to interfere with Major Mart's business relations. Major Mart points to an extensive record of interrupted service, skipped deliveries, and internal Mitchell emails, which contemplate retaliatory actions against Major Mart.

Major Mart contends that Mitchell intended these actions to cause damage. Specifically, Major Mart says Mitchell deprived Major Mart's stores of Anheuser–Busch products knowing that out-of-stock situations and inconsistent supplies would influence Major Mart customers to go to Major Mart's competitors to buy Anheuser–Busch products.

Major Mart further contends that Mitchell engaged in these tortious acts as retaliation for Major Mart's decision to promote Miller and Coors beer. In support of its damages, Major Mart presents the regression analysis of Dr. Sharp. The

damages shown in this analysis, says Major Mart, were proximately caused by Mitchell's actions.

In defense, Mitchell argues that its decision to cut deliveries to Major Mart was a business decision, motivated by Major Mart's declining sales of Anheuser–Busch products. Mitchell further contends that its interactions with Major Mart following the decision to cut deliveries also represented business decisions.

This court is not persuaded to grant summary judgment on this tortious interference claim. Disputed issues of fact remain as to Mitchell's motivation in changing its service to Major Mart.

### E. Allegations Against Mitchell Distributing

Mitchell Distributing filed a separate Motion for Summary Judgment [docket no. 113] arguing that the undisputed facts show that Mitchell Distributing is not responsible for any of the alleged acts committed against Major Mart. Specifically, Mitchell Distributing asserts that it is a separate beer distributor from Mitchell Beverage.

Mitchell Distributing is a licensed beer distributor for Anheuser–Busch. Mitchell Distributing is licensed to sell Anheuser–Busch products to retailers in Winston County, Neshoba County, Kemper County, Scott County, Newton County, Lauderdale County, and Clarke County.

Likewise, Mitchell Beverage is a licensed beer distributor for Anheuser–Busch. Mitchell Beverage, however, is licensed to sell Anheuser–Busch products to retailers in Prentiss County, the southern part of Tishomingo County, Union County, Lee County, Chickasaw County, Monroe County, Clay County, Lowndes County, Oktibbeha County, and Noxubee County.

Major Mart's B–Quik stores are located in Clay County, Lowndes County, Oktibbeha County, Lee County, Prentiss County, and Union County. Because all of Major Mart's stores are located within Mitchell Beverage's sales territory, Major Mart can only purchase Anheuser–Busch products from Mitchell Beverage. *See* Miss.Code Ann. § 27–71–349(1). Therefore, Mitchell Distributing argues that there can be no claims against it because it neither sold nor refused to sell Anheuser–Busch products to Major Mart or its competitors.

Mitchell Beverage and Mitchell Distributing, however, consistently have referred to themselves as one entity, "Mitchell", up until this point. Furthermore, in an April 27, 2011 affidavit filed in the Oktibbeha County Chancery Court action, Adam stated that he was the "President of Mitchell Distributing Company" and that Mitchell Distributing Company was the Anheuser–Busch distributor in Oktibbeha County, Lowndes County, and Clay County, all allegedly in the Mitchell Beverage areas.

Other elements in the record reflect a lack of distinction between the two companies. Emails from Tony Carley, who has been identified as a Mitchell Beverage employee, include an electronic signature that reads:

TONY CARLEY

General Sales Manager

Mitchell Distributing

1200 Industrial Park Rd. Columbus, MS 39701

(662) 328–3551 Fax: (662) 327–3254

www.mitchellcompanies.com

*See, e.g.,* Email, docket no. 101, exh. 22. Not only does the signature identify the Mitchell Beverage employee as a sales manager for Mitchell Distributing, it also provides a Columbus, Mississippi address for Mitchell Distributing, which is sup-

posed to be located in Meridian, Mississippi. Likewise, emails from Manny and Adam contain the Mitchell Distributing logo as opposed to a Mitchell Beverage logo. *See, e.g.,* Email, docket no. 101, exh. 25; Email, docket no. 101, exh. 33.

This court denies the Motion for Summary Judgment [docket no. 113]. The record is replete with instances where Mitchell Distributing and Mitchell Beverage have considered themselves as one entity and have acted in concert. The court will carry the issue of Mitchell Distributing's liability to trial.

### V. MOTION IN LIMINE [DOCKET NO. 106]

■■■ Major Mart asks the court to strike certain expert opinions of Greg Ellis ("Ellis") and limit his expert testimony pursuant to the Federal Rules of Evidence. On page 6 of his report, Ellis opined on the defendants evaluation of the routing decision and stated that the "reduction of delivery frequency to these six stores was consistent with Mitchell Beverage's companywide reroute based on the sales trend of these stores, delivery time and drop time." Ellis, however, relies exclusively upon the testimony of Adam to conclude that Mitchell's routing decisions were objective and based on sound business practice. Major Mart contends that Ellis is merely "parroting" the conclusory statements of Adam.

This court agrees. Before the court addresses the weight of a particular expert witness' testimony, the court must address the testimony's admissibility. Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

■■■ Rule 702 specifically requires that the expert's testimony be based upon sufficient facts or data. *Guillory v. Domtar Indus., Inc.,* 95 F.3d 1320, 1330–31 (5th Cir.1996). "An expert's opinion must be preceded by facts in evidence and cannot be the basis of speculation or conjecture." *Lewis v. Parish of Terrebonne,* 894 F.2d 142, 146 (5th Cir.1990). An expert is not allowed to give opinions based on speculation or erroneous facts. *Slaughter v. S. Talc Co.,* 919 F.2d 304, 307 (5th Cir.1990).

This court is not persuaded that Ellis' testimony will aid the trier of fact. Ellis merely parrots Adam's testimony and, therefore, he lacks a knowledgeable basis. Therefore, the court grants the Motion in Limine [docket no. 106].

### VI. MOTION IN LIMINE [DOCKET NO. 107]

Major Mart asks the court to strike certain expert opinions of William C. Myslinski, Ph.D. ("Dr. Myslinski") and to limit his expert testimony pursuant to the Federal Rules of Evidence. Dr. Myslinski seeks to provide opinion testimony regarding the pro-competitive benefits of the defendants' exclusive right to distribute Anheuser–Busch in its territories. Major Mart contends that the defendants' exclusive right to distribute is relevant to evaluating market power, but testimony regarding the pro-competitive benefits of the

defendants' exclusive right to sell is not relevant to any of the claims or defenses. Major Mart avers that it is not attacking the defendants' exclusive right to sell Anheuser–Busch beer in their territories.

■■■ Major Mart, then, asks the court to find such testimony irrelevant under Rule 401 [22] of the Federal Rules of Evidence. Even if the testimony were relevant, Major Mart contends that the testimony regarding the pro-competitive benefits of exclusive distribution contracts should be excluded under Rule 403 [23] because its admission would be confusing and potentially misleading to the jury.

This court is not persuaded to limit Dr. Myslinski's testimony on this ground. Major Mart contends that Mitchell has harmed competition within the relevant market. Mitchell is offering Dr. Myslinski's testimony in an attempt to explain fully the statutory beer distribution system in Mississippi. This court is persuaded that this discussion will aid the trier of fact.

Major Mart also asks the court to strike Dr. Myslinski's attacks on the regression analysis conducted by Dr. Sharp, Major Mart's expert. Dr. Myslinski criticizes the regression analysis, but failed to conduct any regression analysis to demonstrate that Dr. Sharp's regression analysis was invalid. Major Mart contends that without such analysis, Dr. Myslinski's analysis is mere speculation.

■■■ The court is not persuaded to grant the Motion in Limine on this ground either. Under Rule 702, if Dr. Myslinski is qualified by knowledge, training, experience or education, and if his testimony will assist the trier of fact, he may testify on a subject, so long as that testimony is the product of reliable principles and methods that have been properly applied to the case. *Shoemake v. Rental Serv. Corp.,* 2008 WL 215819 \*1 (S.D.Miss. Jan. 22, 2008). There is no challenge to Dr. Myslinski's knowledge in this field. Dr. Myslinski's criticism of Dr. Sharp's regression analysis can be addressed on direct- and cross-examination.

## VII. MOTION IN LIMINE [DOCKET NO. 108]

Major Mart asks the court to strike certain expert opinions of Ralph J. Stephens ("Stephens") and limit his expert testimony pursuant to the Federal Rules of Evidence. As with Dr. Myslinski, Major Mart challenges Stephens' report because Stephens criticizes the regression analysis conducted by Dr. Sharp without conducting his own regression analysis. Major Mart provides the same arguments as it did in opposition to Dr. Myslinski's report and testimony. This court denies the Motion in Limine for the same reasons it denied the motion regarding Myslinski's testimony.

To the extent that Mitchell intends to have Stephens testify to Mitchell's lost profits, the parties will craft a stipulated order so as not to infringe on any confiden-

---

**22.** Rule 401 of the Federal Rules of Evidence states:

Evidence is relevant if:
(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
(b) the fact is of consequence in determining the action.

**23.** Rule 403 of the Federal Rules of Evidence states:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

tiality involved in the settlement of Mitchell's counterclaim.

## VIII. MOTION TO STRIKE [DOCKET NO. 118]

Mitchell asks this court to strike the Supplemental Report of Dr. Sharp. One month after he had been deposed, Dr. Sharp filed a Supplemental Report that defendants claim substantially alters his opinions. Mitchell asserts that it received the Supplemental Report on June 30, 2014, after the close of business hours on the final day for discovery and motions. Dr. Sharp claims that the Supplemental Report is based on new information, but defendants contend that most or all of the information on which the Supplemental Report is based has been available to Major Mart for months prior to the previously-filed expert report.

This court denies the Motion to Strike. Dr. Sharp did not alter his methodology in the Supplement Report. The Supplemental report simply includes additional data that was not available at the time of the initial trial report.

## IX. MOTION TO STRIKE [DOCKET NO. 119] AND MOTION IN LIMINE [DOCKET NO. 121]

Mitchell asks the court to strike Jimmy Brown ("Brown") as a potential trial witness and strike Brown's affidavit [docket no. 119]. Further, Mitchell asks the court to exclude all statements and communications made in connection with settlement negotiations between Mitchell's counsel and Major Mart's counsel in response to the temporary restraining order [docket no. 121]. The negotiations revolved around Major Mart's desire for twice-per-week deliveries and Mitchell's desire for increased shelving space. These negotiations, however, says Mitchell, are settlement discussions relating to the Oktibbeha

County Chancery Court matter and, therefore, are privileged.

Major Mart argues that these negotiations were business discussions, not discussions of legal issues. Furthermore, Major Mart argues that it does not seek to introduce evidence of the negotiations to demonstrate that Mitchell admitted any guilt or liability. Major Mart, instead, asserts that it wishes to show that Mitchell sought to increase its shelving space through these negotiations.

Rule 408 of the Federal Rules of Evidence protects statements and conduct made by parties in the course of settlement negotiations. The Rule states:

(a) Prohibited Uses. Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

(1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

The intent of Rule 408 is "to encourage settlements by fostering free and full discussion of the issues." *Ramada Dev. Co. v. Rauch,* 644 F.2d 1097, 1106 (5th Cir. 1981).

This court is persuaded to grant both the Motion to strike [docket no. 119] and the Motion in Limine [docket no. 121]. The proposed evidence and testimony are

the direct product of settlement negotiation and, therefore, are privileged.

## X. CONCLUSION

For the foregoing reasons this court grants in part the Motion to Dismiss [docket no. 12], but only as to Major Mart's claims under Miss.Code Ann. § 67–7–1, *et seq.,* and Miss.Code Ann. § 27–71–349.

This court also grants in part the Motion for Summary Judgment [docket no. 86], but only with regards to the Robinson–Patman Act claim. The court denies the Motion for Summary Judgment [docket no. 86] with regards to the Sherman Act claims, the Mississippi antitrust claim, and the tortious interference claim. The court further denies the Motion for Summary Judgment [docket no. 113] as to Mitchell Distributing.

As to Major Mart's evidentiary motions, the court grants the Motion in Limine [docket no. 106] to exclude the testimony of Ellis; denies the Motion in Limine [docket no. 107] to exclude the evidence of Dr. Myslinski; and denies the Motion in Limine [docket no. 108] to exclude the testimony of Stephens.

As to Mitchell's evidentiary motions, the court denies the Motion to Strike [docket no. 118] Dr. Sharp's Supplemental Trial Report; grants the Motion to Strike [docket no. 119] Brown's affidavit and trial testimony; and grants the Motion in Limine [docket no. 121] to exclude all references to settlement of the Oktibbeha County Chancery Court matter.